IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-01707

KURT ROSE,

    Plaintiff,

v.

CITY OF BOULDER,

    Defendant.

**COMPLAINT AND JURY DEMAND**

Plaintiff Kurt Rose, by and through his attorneys, Sweeney & Bechtold LLC, hereby submits his Complaint against the above-named Defendant as follows:

## INTRODUCTION

1. Plaintiff Kurt Rose is a former employee of the City of Boulder ("City") who was discriminated against on the basis of race and retaliated against after complaining about this unlawful treatment, up to and including being terminated, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII").

## PARTIES

2. Plaintiff Kurt Rose is a resident of the State of Colorado.

3. Defendant City of Boulder is a municipality in the State of Colorado.

4.  The City of Boulder's Community Vitality Department is located at 1500 Pearl Street, Suite 302 in Boulder, Colorado 80302.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, in that this action arises under a federal civil rights law, specifically Title VII.

6.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices alleged herein were committed within this judicial district.

7.  At all relevant times, Defendant City of Boulder was covered by the definition of "employer" set forth in 42 U.S.C. § 2000e(b) of Title VII.

8.  The procedural prerequisites for the filing of this suit have been met: Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the U.S. Department of Justice issued a Notice of Right to Sue letter to Plaintiff within 90 days of this filing.

## SPECIFIC ALLEGATIONS

9.  Plaintiff Kurt Rose is an African American male who began working as a "Maintenance Person I" at the City's Downtown University Hill Management Division and Parking Services Division on or around April 2006.

10. The City later changed this Division to the Department of Community Vitality.

11. Throughout his employment with the City, Plaintiff's performance was satisfactory or better.

12. Regardless of Plaintiff's excellent performance, starting in or around 2017, he was subjected to race-based discrimination and harassment by his then-supervisor, Patrick Judd.

13. Among other things, Mr. Judd:

    a. Falsely accused Plaintiff of not performing his job duties;

    b. Arranged for other employees, including Lynn Martin, to surveil Plaintiff during the day and report back any details; and

    c. Falsely reported to management that Plaintiff was not at work.

14. Plaintiff reported Mr. Judd's behavior to management but received no support and the race-based discrimination intensified after Plaintiff complained.

15. In 2017, Mr. Judd lashed out at Plaintiff during a conversation, including raising his voice and calling Plaintiff a "fucking nigger" in front of at least one witness.

16. Plaintiff reported this serious instance of discrimination to the City's Human Resources department in August of 2017.

17. Two months later, the City informed Plaintiff that it had found that his claim of discrimination was unfounded.

18. In 2018, for reasons unrelated to Plaintiff's complaints, the City demoted Mr. Judd and replaced him with Lynn Martin, who became Plaintiff's manager.

19. Mr. Martin continued Mr. Judd's poor treatment of Plaintiff, for example, telling Plaintiff's partner that Plaintiff would "never move up" at the City "because of who he is."

20. Mr. Martin spoke poorly of Plaintiff to other City employees, including Melissa Yates, Plaintiff's second-level supervisor and Manager of Community Vitality.

21. Ms. Yates apparently adopted Mr. Martin's low opinion of Plaintiff; among other things, she openly accused him of being a "horrible person" and "taking advantage" of and intentionally causing legal trouble for his Caucasian ex-wife, who was also a City employee.

22.     Although Plaintiff consistently showed up for work and performed all that was asked of him, the City continued to send other employees to check up on Plaintiff during the workday regularly without justification.

23.     In late 2018/early 2019, Plaintiff brought this continued surveillance to Mr. Martin's attention and specifically stated that it was part of a continuing pattern of discriminatory behavior.

24.     Neither Mr. Martin nor anyone else at the City did anything to address Plaintiff's concerns.

25.     Throughout Plaintiff's career with the City, he was paid significantly less than his Caucasian and other non-African American colleagues and was passed over for training and promotions.

26.     For example, in the spring of 2019, the City promoted Andrew Kesterman, a Caucasian part-time maintenance employee, to a full-time Maintenance Person II.

27.     At the time of his promotion, Mr. Kesterman had a felony conviction, just nine months of employment at the City, and a history of being a no-call-no-show for several consecutive days.

28.     When Plaintiff asked Mr. Martin why Plaintiff had not had the opportunity to apply for the position, Mr. Martin claimed that the Maintenance II position had been posted and that Mr. Kesterman had applied for and received it.  A subsequent review of all job postings that year revealed that no such posting existed.

29.     In May 2019, the City provided Douglas Moore, a Caucasian male who had been employed as a Maintenance I for mere weeks, the opportunity to train and apply for a Meter Technician position.

4

30.     The City provided Mr. Moore with this opportunity despite the fact that Mr. Moore showed up late nearly every day during his first few weeks of employment.

31.     The City failed to offer this same opportunity to Plaintiff even though he had repeatedly expressed interest in this same training, was the most senior Maintenance I at the City at the time by about eight years, and had an unblemished attendance and performance record.

32.     The training that Mr. Moore received guaranteed him the Meter Technician role, which was accompanied by a promotion and pay grade increase.

33.     Around the same time, Plaintiff learned that Mr. Martin was also training another new non-African American employee, who had been with the City for barely five months, on Meter Technician's duties, which would allow this individual to successfully compete for the next Meter Technician opening.

34.     When Plaintiff brought this issue to Mr. Martin, Mr. Martin denied that the training was occurring.

35.     By the end of May 2019, Plaintiff's frustration with his poor treatment became unbearable and he wrote an e-mail to several of the City's management-level employees, including Mr. Martin, Ms. Yates, the Deputy Director of Community Vitality Cris Jones, and the Director of Community Vitality and Parks and Recreation Yvette Bowden, in which he expressed his concerns that he was being discriminated against because of his race.

36.     Mr. Jones responded within a few days but did nothing to address Plaintiff's concerns.

37.     Not a single other recipient of the e-mail responded for six weeks; Ms. Bowden finally scheduled a meeting with Plaintiff for July 1, 2019.

38. During the meeting, Plaintiff reiterated his concern that he was being treated differently because of his race, including that he was being surveilled and denied promotional and training opportunities, and that other non-African American co-workers were being treated more preferably.

39. Rather than address Plaintiff's concerns, Ms. Bowden blamed him for his difficulties, including accusing Plaintiff of not being a "team player" and directing him to "look into [him]self" to see if he was the problem.

40. No investigation was conducted in Plaintiff's formal complaint.

41. After Ms. Bowden offered no support or further follow up, Plaintiff told her that he planned to file a charge of discrimination with the EEOC.

42. In August 2019, Mr. Martin presented Plaintiff with a list of eleven concerns about him that had purportedly been reported by his co-workers.

43. This list included entirely baseless and offensive concerns, including that Plaintiff made "sexual comments and remarks about women who walk by in the work area," which was patently false.

44. Other concerns pertained directly to Plaintiff's protected activity, including that he had "negative opinions about the department, department staff, and the city" and that his negative comments about the City made the environment "uncomfortable" for staff.

45. When Plaintiff requested further detail about these complaints, including the names of the complaining employees and/or the dates of the alleged misconduct, Mr. Martin failed to provide either.

46.     After Plaintiff said that he welcomed an investigation into these matters because the allegations were untrue, the City appeared to drop them altogether.  No investigation was conducted to clear Plaintiff's name.

47.     In or around August 2019, Plaintiff sent a request to Karen Stone in the City's HR department asking for an investigation into the discriminatory and retaliatory conduct of the City's management.

48.     Ms. Stone set up a meeting with herself, Plaintiff, and Deputy Director Cris Jones.

49.     Rather than address Plaintiff's concerns at this meeting, however, Ms. Stone and Mr. Jones unfairly criticized Plaintiff for an e-mail that he had sent to his work group the week prior in which he expressed concerns about the organization of the workspace and the fact that a number of his personal items had gone missing.

50.     Ms. Stone then asked if Plaintiff had considered accepting a severance since he was "not happy" at the City.

51.     A couple of days after this meeting, Plaintiff told Mr. Martin that he was planning on staying at the City and anticipated filing a charge of discrimination with the EEOC.

52.     Just two weeks later, on September 17, 2019, the City put Plaintiff on administrative leave.

53.     Although Plaintiff was told at the time that this was done so that the City could investigate his claims of discrimination and harassment, he subsequently learned that this was not the case.

54.     On September 24, the City informed Plaintiff that the true reason behind his suspension was that he had supposedly made threatening comments, including that the City was "poking the

bear" by continuing to treat him poorly and that he had "not been taking [his] medication." Plaintiff made neither of these statements.

55.Following an investigation into the matter, City Risk Manager James Brown sent a memo to Ms. Bowden and a City Attorney on October 18, 2019 in which he stated that the allegations were unsubstantiated and based solely on a "gut feeling" from two of Plaintiff's co-workers; as a result, he recommended that the City return Plaintiff to work.

56.Despite Mr. Brown's conclusion, the City treated Plaintiff as if he was at fault, including by sending Plaintiff a letter, with carbon copies to Mr. Martin, Ms. Bowden, and Ms. Stone, in which the City inferred that Plaintiff did not understand the expectations of his employment and was failing to meet certain expectations. It further directed him to have a "facilitated conversation" with Mr. Martin.

57.The City finally allowed Plaintiff to return to work on November 6, 2019.

58.The City suspended Plaintiff again on November 14 and terminated him five days later for allegedly turning in 14 daily work logs late or not at all in 2019 and for failing to attend a "mandatory" meeting with Mr. Martin on November 12, 2019.

59.With respect to the work logs, Plaintiff occasionally turned work logs in late; however, work logs had been turned in late by non-African-American employees in the past without issue and Plaintiff was never warned about this conduct, let alone put on notice that it could result in termination.

60.With regard to the meeting Plaintiff missed, Mr. Martin did not tell Mr. Rose that the meeting was mandatory and Plaintiff had told Mr. Martin that he could not meet at the requested time because of work obligations.

61.     Mr. Martin also never advised Plaintiff that the meeting was mandatory or that not attending would result in discipline, let alone termination.

62.     The other reasons for Plaintiff's termination that Mr. Martin included in the final termination letter are uncorroborated and/or nonsensical.

63.     For example, Mr. Martin indicated that Plaintiff's past disciplinary record contributed to the termination decision; however, Plaintiff's disciplinary record consisted of an innocuous note in 2014 about an error in his use of his City credit card, which he never repeated, and the recent suspension in fall 2019 that was reversed for a lack of substantiation.

64.     Mr. Martin further contended that Mr. Rose's tenure, performance, and dependability factored into the termination decision; however, all three factors point to Plaintiff's outstanding record that is supported by satisfactory or better performance reviews over 13 years of loyal employment.

65.     On May 29, 2020, Plaintiff filed charge of discrimination no. 541-2020-00006 with the EEOC, in which he alleged discrimination based on race and retaliation.

66.     The U.S. Department of Justice's Civil Rights Division issued a Notice of Right to Sue to Plaintiff for this charge of discrimination on March 24, 2021.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Race Discrimination in Violation of Title VII, as amended)

67.     The foregoing allegations are realleged and incorporated herein by reference.

68.     By virtue of his race (African-American), Plaintiff belongs to a protected group under Title VII.

69. Defendant subjected Plaintiff to less favorable terms and conditions of his employment based on race. This treatment included, but is not limited to: subjecting Plaintiff to a hostile work environment, denying Plaintiff training or promotional opportunities, paying Plaintiff less than similarly situated non-African American employees, subjecting Plaintiff to undue scrutiny and criticism, suspending Plaintiff without cause, and ultimately terminating Plaintiff.

70. As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## SECOND CLAIM FOR RELIEF
(Retaliation in Violation of Title VII, as amended)

71. The foregoing allegations are realleged and incorporated herein by reference.

72. Plaintiff participated in statutorily protected activity by opposing practices targeted at him that were unlawful under Title VII.

73. As a result of Plaintiff's protected opposition to discrimination, Defendant retaliated against him by subjecting him to less favorable terms and conditions of employment as described in this Complaint, including but not limited to: refusing to take remedial action in response to Plaintiff's complaints that he was being discriminated against, subjecting Plaintiff to undue scrutiny and criticism, suspending Plaintiff without cause, and ultimately terminating Plaintiff.

74. Defendant's conduct violated 42 U.S.C. § 2000e-3(a) of Title VII.

75. As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and

emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

76. As a proximate result of the Defendant's actions, Plaintiff has suffered and continues to suffer a loss of wages and benefits, a loss of job, emotional distress, inconvenience, mental anguish, loss of enjoyment of life and other consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kurt Rose respectfully requests that this Court enter judgment in his favor and against Defendant City of Boulder and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B. Back pay and benefits;

C. Reinstatement or front pay and benefits;

D. Injunctive and/or declaratory relief;

E. Attorney fees and costs of the action, including expert witness fees, as appropriate;

F. Pre-judgment and post-judgment interest at the highest lawful rate; and

G. Such further relief as justice allows.

## PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted June 22, 2021.


          By:    SWEENEY & BECHTOLD, LLC

                s/Charlotte N. Sweeney
                650 S. Cherry St., Ste. 700
                Denver, CO 80246
                Telephone: (303) 865-3733
                Fax: (303) 865-3738
                E-mail: cnsweeney@sweeneybechtold.com


                s/Ariel B. DeFazio
                650 S. Cherry St., Ste. 700
                Denver, CO 80246
                Telephone: (303) 865-3733
                Fax: (303) 865-3738
                E-mail: abdefazio@sweeneybechtold.com


                ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
602 Barberry Drive
Longmont, CO 80503

## CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the bar of this Court.

By:     SWEENEY & BECHTOLD, LLC

s/Charlotte N. Sweeney
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Ariel B. DeFazio
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: abdefazio@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF